In re the MARRIAGE OF Connie
L. GOURLEY and Ewing B.
Gourley.

Connie L. GOURLEY, Appellant,

v.

Ewing B. GOURLEY, Respondent.

No. 16839.

Missouri Court of Appeals,
Southern District,
Division Two.

May 31, 1991.

Motion for Rehearing or to Transfer
Denied June 21, 1991.

Application to Transfer Denied
July 23, 1991.

Richard E. Dorr, C. Ronald Baird, Dorr, Baird and Lightner, B.H. Clampett, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, for appellant.

Robert C. Fields, Devon F. Sherwood, Sherwood, Honecker & Bender, Springfield, for respondent.

FLANIGAN, Chief Judge.

This action for dissolution of marriage was instituted, in April 1986, by Connie L. Gourley against her husband Ewing B. Gourley. The parties, who will be referred to by their first names, were married on October 16, 1964, and separated on February 7, 1986. The parties have two children, Jennifer Gourley, who was born March 15, 1971, and Jefferson Gourley, who was born May 4, 1974. In 1988, the trial court held a hearing which lasted 12 days.

On January 12, 1990, the trial court issued its decree which: (a) dissolved the marriage as of February 1, 1988; (b) awarded the parties joint legal custody of both children, with physical custody of Jennifer to be with Ewing and physical custody of Jefferson to be with Connie; (c) awarded no child support to either party but required the party with physical custody to be responsible for the support of that child; (d) required Ewing to provide medical and hospitalization insurance for both children until emancipation; (e) divided the marital property by awarding Connie assets valued by the court at $2,239,451 and awarding Ewing assets valued by the court at $2,241,239; (f) set apart to Connie nonmarital property valued at $55,000 and set apart to Ewing nonmarital property valued at approximately $1,000; (g) required Ewing to pay "$75,000 cash" to Connie; (h) required Ewing to pay $25,000 to Connie's attorneys "as a partial attorney fee award"; (i) imposed on Ewing marital debts totaling $18,150; and (j) denied Connie's request for an award of maintenance.

Connie's 21 witnesses included a bank president, a gemologist, four real estate experts, personal property experts, and four accountants. Ewing's witnesses included an accountant, an attorney, an antique appraiser and a personal property expert.

Prior to the trial, both sides requested that the trial court make findings of fact. After the trial, Connie submitted 186 proposed findings. The court held several post-trial conferences with counsel concerning Connie's proposed findings and findings proposed by Ewing. The record of those conferences occupies 435 pages of the transcript. The court accepted many of the proposed findings, amended others and rejected the remainder. The trial court incorporated the accepted and amended

findings in its judgment. Connie alone appeals.

In general, Connie contends that the trial court erred: (1) in dividing the marital property; (2) in failing to award Connie child support for Jefferson; and (3) in failing to award a larger sum for Connie's attorneys' fees. Connie requests this court to grant the following relief: (a) change the trial court's valuation of certain items of the marital property and award Connie, as her share of the marital property, assets totaling $3,218,492; (b) require Ewing to pay child support for Jefferson in the amount of $2,500 per month, retroactive to February 1, 1988; and (c) increase the amount awarded Connie for attorneys' fees from $25,000 to $100,000.

Connie's first two points, which will be considered together, challenge the trial court's division of the marital property. Connie contends that the trial court treated inconsistently substantial tax refunds and potential tax refunds, overlooked or ignored certain property of substantial value which was in Ewing's possession, and grossly undervalued certain property set off to Ewing. Connie further contends, in a more general attack upon the trial court's division of the marital property, that "an adequate compensating adjustment was not made for the substantial amount of marital property squandered, dissipated, or used unacceptably by Ewing between the time of separation and the time of trial."

■■■ The Dissolution of Marriage Act consigns the division of marital property to the sound discretion of the trial court. *Colabianchi v. Colabianchi,* 646 S.W.2d 61, 64 (Mo. banc 1983). Appellate courts must defer to the trial court's judgment unless the judgment is improper under the principles of *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), or an abuse of discretion is shown. *Dardick v. Dardick,* 670 S.W.2d 865, 868 (Mo. banc 1984). The judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or applies the law. "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy,* at 32.

Section 452.330,[1] as amended by L.1988, reads in pertinent part:

"1. In a proceeding for dissolution of the marriage ... the court shall set apart to each spouse his nonmarital property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors including:

(1) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children;

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and

(5) Custodial arrangements for minor children."

The following table lists the marital assets as valued and distributed by the trial court:

|  | Connie | Ewing |
|---|---|---|
| Real Estate |  |  |
| Residence | $ 515,000 |  |
| East Sunshine Lot |  | $  42,500 |
| 1505 East Trafficway |  | 120,000 |

1. Except where otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

|  | Connie | Ewing |
|---|---|---|
| Vehicles |  |  |
| 4 vehicles | 42,000 |  |
| 10 vehicles |  | 39,650 |
| Boats | 54,151 | 143,550 |
| Household furnishings | 90,000 | 8,000 |
| Property left from HCA |  | 65,000 |
| Notes Receivable |  |  |
| Park Plaza note | 440,000 |  |
| Additional receivables | 23,308 | 1,356 |
| Business entities assets |  | 99,500 |
| Insurance policies | 2,766 | 2,970 |
| Checking & savings accounts | 1,072,226 | 1,736,863 |
| TOTAL | $2,239,451 | $2,259,389 |
| Debts |  | 18,150 |
|  |  | $2,241,239 |

The record on appeal, which this court has examined in light of Connie's contentions on appeal, includes a 26–volume transcript[2] and a legal file containing 622 pages. Such a record defies synopsis.

Both Connie and Ewing hold master's degrees conferred by the University of Missouri. Prior to 1981, Ewing was employed in various positions by the state of Missouri. Connie also had outside employment which included doing personnel work for a medical center, owning and operating an antique store, and working as a psychiatric social worker for a health center.

In 1981, they formed a corporation called Health Care Affiliates, Inc. (HCA), and a single stock certificate representing all of the shares was issued to them jointly. The operations of HCA from 1981 until the sale of the majority of its assets in September 1985, increased the family's income dramatically.

HCA was in the nursing home management business. Both Ewing and Connie were full-time employees of HCA. Ewing was president of HCA and the record leaves no doubt that he was its moving force. Connie dealt primarily with personnel matters.

The success of HCA, which was a "Subchapter S" corporation (for tax purposes), is shown by the impact its operations had upon the adjusted gross income of Ewing and Connie, as stated in their joint tax returns:

1981 — $69,389
1982 — 662,754
1983 — 1,808,268
1984 — 1,645,513
1985 — not filed in this court.

---

2. Rule 81.14 requires, among other things, that the pages of the transcript be numbered consecutively and that the transcript contain a complete index at the front thereof designating the specific volumes and pages where various matters, including "evidence, exhibits, and documentary evidence," may be found. It also provides, "Exhibits shall be identified in the index by number or letter and page and, in addition, shall be described so that the court can distinguish the exhibits."

No such "complete index" appears at the front of, or anywhere else in, the transcript. Although each volume of the 26–volume transcript lists, by number or letter, exhibits mentioned in that volume, there is no description of any exhibit.

A gratuitous examination of the 26 volumes by this court shows that Connie offered 315 exhibits and 310 were admitted into evidence. In this court, Connie filed 10 exhibits and described each of them by number. No other description was given. Ewing, as respondent, filed 18 exhibits and accompanied them by a proper index with appropriate descriptions.

When an exhibit is omitted from the transcript and is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to appellant. *Doyle v. Doyle,* 786 S.W.2d 620, 621 (Mo.App.1990).

Since this case involves minor children, and since Ewing has filed no motion seeking an involuntary dismissal of Connie's appeal, this court concluded not to invoke Rule 84.08 which authorizes a dismissal of an appeal, under certain conditions, for procedural defects.

In September 1985, most of the assets of HCA were sold for $3,000,000. By January 1, 1986, HCA was in the process of liquidation, which had to be completed by July 31, 1986. HCA's employee force, which at one time included 60 office employees and 50 nursing home administrators, was reduced to 5, including Ewing.

At the outset of the liquidation, Connie signed a consent, pursuant to § 337 of the 1954 Internal Revenue Code, authorizing Ewing, as president of HCA, to execute the liquidation of HCA. During liquidation, Ewing used marital funds to purchase an IBM System 36 computer system, which HCA had used under a lease-purchase contract with IBM. During liquidation, some of HCA's equipment was sold. That which was unsold was divided in kind, by Ewing, between him and Connie. The proceeds of the sale of the HCA business were placed in a joint money market account, which required the signatures of both Ewing and Connie for withdrawal of funds. The balance of that account at time of trial exceeded $900,000.

HCA was headquartered in a building on Trafficway in Springfield. The building was owned individually by Ewing and Connie and was mortgaged. HCA occupied the building as lessee.

In early 1986, Ewing formed another corporation called DRI. By this time, the marriage was failing, and Connie filed this dissolution action in April 1986. Much of the dispute centers around Ewing's use of HCA's equipment and its reduced office staff, and his use of marital funds for the support of DRI and several other business enterprises in which he engaged after January 1, 1986. Some of these enterprises were corporations solely owned by Ewing. Others were partnerships in which he had an interest.

Beginning with the tax year 1986, the parties filed separate income tax returns. The most recent income tax return of Connie, filed in this court, is her 1984 U.S. joint return. The most recent income tax return of Ewing, filed in this court, is his 1986 U.S. individual return. Connie received income tax refunds, for 1986 and 1987, totaling $54,601. Connie's accountant testified that, in connection with her 1986 U.S. income tax return, she "overpaid" $33,308, for which she could file an amended return. The trial court treated that as a marital asset, awarded it to Connie, and valued it at $23,308. Ewing's 1986 U.S. individual tax return showed that he claimed a refund for that year of $67,406.

From January 1, 1986, to July 31, 1986, the office staff, equipment and office space of HCA in the Trafficway building were used for the benefit of DRI. DRI provided management services to a nursing home for which DRI received $14,000 a month. DRI, in turn, paid approximately $14,000 a month to HCA.

Commencing May 1, 1984, the Trafficway building was leased by Ewing and Connie to HCA for a term of 15 years at a monthly rental of $4,332.13. On July 31, 1986, this lease was assigned by HCA to DRI. At that time, it was agreed between Ewing and Connie that from the rent, Ewing would make mortgage payments of $2,530.48 a month to the mortgagee on the building and split the balance of approximately $1,800 between Ewing and Connie, each to receive about $900 a month. In January 1987, Ewing stopped paying Connie $900 but continued to make the mortgage payments.

Two other tenants in the Trafficway building each paid monthly rent of $200 to Ewing. Ewing retained that rent and gave Connie none of it.

On October 2, 1986, Ewing borrowed $250,000 from Mercantile Bank, of which he was a director, and pledged marital funds as security for the note. He borrowed the money as the first step to obtain financing to complete a business venture known as Exotic Animal Paradise. He obtained the loan in cash, in $50 and $100 bills, and delivered them to one Benjamin Brown in exchange for a promissory note of Brown and an entity known as First National Resources Trust with which Brown was connected. The note provided for a payment of $350,000 plus interest, and matured in 30 days. Brown, with Ewing's knowledge, delivered the $250,000 to

a woman named Motala, who disappeared with the money. The trial court found the $350,000 note to be worthless. Ewing used marital funds to make monthly interest payments of $1,700 on the $250,000 note held by the bank, but made no principal payments. The security given for the $250,000 note is a component of Ewing's share of the marital property as divided by the trial court. Although Ewing is personally liable on the $250,000 note, the trial court did not treat that liability as a marital debt and gave Ewing no credit therefor.

Ewing became acquainted with Carol Van Loo and, at least as early as the spring of 1985, they became intimate. They took several trips together, financed by marital funds. Connie's evidence showed that the trip expenses amounted to at least $9,717. Using marital funds, Ewing gave Carol gifts worth at least $15,800. Ewing used airplanes owned by HCA to visit Carol, who lived in Jefferson City. Ewing spent over $2,600 for long distance phone expense in calls to Carol. Ewing married Carol on July 29, 1988, and since that time Carol and her two minor children by a prior marriage have made their home with Ewing.

At the start of the trial, Ewing submitted to the court a "Master Property List," listing items of marital property. On that list, Ewing and Connie indicated their respective values for each item. The trial court incorporated that list in its decree, and made its own valuation of each item.

In April 1987, Ewing obtained from the Missouri Department of Health two Certificates of Need (CON's) in connection with the proposed construction of two nursing homes in the St. Louis area. The value of the two CON's was the subject of dispute.

From April 1986 to time of trial, Jefferson lived with Connie most of the time, and Jennifer lived with Connie two-thirds of the time. Each of the two children stayed with Ewing when they were not with Connie. Prior to trial, Connie received no child support payments from Ewing. Connie has had no employment since September 1985.

As Connie's brief points out, Jefferson and Jennifer have become accustomed to a high standard of living, including the availability of expensive boats, cars and all-terrain vehicles, the use of aircraft owned by HCA, extensive vacations, and expensive clothing. For the years 1984 and 1985, according to Connie, Ewing and Connie established a lifestyle which consumed average expenditures of $1,197,318 per year.

Connie challenges the trial court's treatment of various assets and Ewing's brief makes counter-contentions.

Connie argues that she received income tax refunds, for 1986 and 1987, totaling $54,601, which the trial court listed as an asset credited to Connie. Connie argues that Ewing's tax returns for 1986 claim a refund of $83,418 (of which $67,406 was claimed on the federal return) which was not considered by the trial court. Ewing counters that he testified that he received his 1986 federal refund of $67,406 and that it was in the bank and was included in one of the bank accounts awarded him by the trial court.

Connie argues that the trial court assigned to her, as an asset valued at $23,308, "a potential tax refund" based upon amending Connie's return for 1986. Connie says: "This was based on a statement by Connie's CPA, who had previously prepared her 1986 tax return, that she could possibly receive this amount of money by filing an amended tax return[s]." Ewing counters that Connie's witness did not use the word "possibly" in connection with the refund. Connie does not mention the fact that her witness testified that the refund would amount to $33,308.

Connie contends that Ewing made a loan, from marital funds, of $191,948, to DRI, and that if the loan is not paid Ewing could realize a tax benefit of $63,982, if he is in the 33⅓ tax bracket, by deducting the loan as a business loss. There was evidence that DRI had no assets. Connie offered no expert testimony that Ewing could obtain a tax benefit. Ewing argues that the trial court is not to be convicted of error in failing to consider income tax effects not shown to exist by qualified and competent testimony.

Connie contends that two bank accounts awarded to Ewing earned interest in the amount of $63,704, which the trial court failed to consider. Ewing counters that the trial court awarded seven checking accounts and six savings accounts to Connie, and awarded two checking accounts and nine savings accounts to Ewing. Connie and Ewing agreed on the value of each of those accounts and the trial court used those values in distributing them. Ewing argues that the trial court is not to be convicted of error because the parties did not compute interest to the moment of decree and that it was sufficient that the trial court valued the accounts as of time of trial.

Connie contends that Ewing should be charged with $47,000 representing the price Ewing paid, using marital funds, for the IBM computer system. Connie argues that the trial court placed a value of $65,000 on all of the remaining HCA inventory distributed to Ewing, and thus the trial court "either didn't consider the computer or vastly undervalued it." Ewing counters that the $47,000 item was a debt of HCA which had to be paid as part of liquidation and that the trial court's valuation of the HCA property, including the computer distributed to Ewing, was within the range of the evidence.

Connie argues that the trial court assigned no value to "LEAP computer software system" which stayed with the System 36 computer when it was distributed to Ewing. Connie contends the software was worth $12,500. Ewing responds that one of his expert witnesses testified that the LEAP system was "worthless," and "it's no good any more."

Connie contends that the trial court grossly undervalued the two Certificates of Need (CON's). The trial court assigned a value of $15,000 to each of the two CON's. Connie argues that the testimony of her expert that the two certificates had a combined value of $285,000 is credible. Connie also argues that the testimony of Ewing's expert that each of the two certificates had a value of $10,000, for a total of $20,000, was unworthy of belief. Ewing counters

that this was a matter of credibility of witnesses and that the trial court's valuation was within the range of the evidence.

Connie argues that the trial court undervalued the Trafficway building which it distributed to Ewing. Connie argues that her expert, Harrison, appraised the building at $365,000 which, taking into consideration a mortgage balance, leaves an equity value of $190,865. The trial court valued the equity at $120,000 and awarded it to Ewing. Ewing counters that his evidence showed the value of the equity to be $62,143 and that the trial court's value was within the range of the evidence.

Connie contends that the trial court undervalued the remaining assets of the HCA inventory which were distributed to Ewing. The trial court's value was $65,000. Connie contends that proper value is $271,194 and that Ewing's evidence that the property was worth $16,153 should be rejected. Ewing counters that the trial court's value was within the range of the evidence.

In her more general attack upon the trial court's division of the marital property, Connie argues that Ewing squandered $1,118,255 of marital property between the time of the separation and the time of trial, and that the trial court failed to accord due significance to that fact. In arriving at that figure, Connie calculates the total funds available to Ewing at $1,436,968, and subtracts Ewing's "known legitimate expenditures" which she calculates at $318,713.

Connie argues that the funds available to Ewing were: "reduction to retained earnings of HCA—$496,016; rental of Trafficway building (at $400 per month)—$11,000; proceeds of Park Plaza note—$334,437; proceeds from DRI (at $14,000 per month)—$336,000; net profit from a new enterprise (Golden Corral)—$130,000; expenditures from Ewing's trust—$129,515. Connie calculates the legitimate expenditures of Ewing, for living expenses for 41 months, at $214,963, and payments on the Trafficway mortgage, for 41 months, at $2,530.48 a month, for a total of $103,750.

Ewing counters that $465,855.56 of the reduction in retained earnings may be ac-

counted for by depreciation of $147,326.86 on fixed assets, and by distributions of profits to shareholders (Connie and Ewing) of $318,528.70, from January 1 to July 31, 1986. Ewing also argues that $121,896.13 was paid to satisfy debts of HCA. Ewing further argues that there was evidence that the total funds available to him amounted to $447,165 and that his legitimate expenses amounted to $524,369.

In a dissolution proceeding, the proper date for valuing marital property is the date of trial. *Taylor v. Taylor*, 736 S.W.2d 388 (Mo.1987); *Doyle v. Doyle*, 786 S.W.2d 620 (Mo.App.1990). The trial court is entitled to believe or disbelieve testimony, including expert testimony, of either party concerning property valuations. *In re Marriage of Smith*, 785 S.W.2d 764 (Mo. App.1990). The trial court has "great flexibility and far reaching power" in dividing marital property, and there is no formula respecting the weight to be given relevant factors which the court may consider. *King v. King*, 762 S.W.2d 544 (Mo.App. 1989). Section 452.330 requires a just division of the marital property, but it does not require an equal division. *Dardick v. Dardick*, 670 S.W.2d 865 (Mo.1984); *Pursifull v. Pursifull*, 781 S.W.2d 262 (Mo.App. 1989). Dissipation of marital funds by a spouse is a factor which may properly be considered. *Hogrebe v. Hogrebe*, 727 S.W.2d 193 (Mo.App.1987). An appellate court will interfere only if the trial court's division of marital property is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Dardick v. Dardick, supra; Weiss v. Weiss*, 702 S.W.2d 948 (Mo.App.1986).

Among the findings of the trial court were the following: Ewing and Connie "did and still have a business acumen to make their endeavors successful"; both Ewing and Connie participated in the acquisition of the marital property; "both parties actually contributed to be a homemaker to a certain extent"; Ewing "had an extramarital relationship with his new wife prior to the separation and after the separation and before their marriage"; Ewing "did use marital property such as airplanes and business buildings and his employees to the detriment of Connie."

The trial court also found: "Of the $496,016 reduction of the retained earnings of Health Care Affiliates between January 1, 1986, and August 1, 1986, $454,541.13 was accounted for by payment of taxes, insurance premiums, and houseboat expenses for the benefit of both parties and depreciation."

Connie's brief stresses that between January 1, 1986, and July 31, 1986, Ewing used funds and assets of HCA for other business interests; that Ewing on January 1, 1987, stopped paying Connie her share of the rent from the Trafficway property; and that Ewing was guilty of marital misconduct beginning in the spring of 1985. All of these factors were known to the trial court and mentioned by it in its judgment.

There was other evidence before the trial court which it could properly consider in dividing the marital property. Most of this evidence is not mentioned by Connie and, indeed, she makes no mention, by number, of any of the findings of fact, almost 200 in all, made by the trial court and incorporated in its judgment.

Ewing introduced documentary evidence showing that for the period of April 1986 to April 1988 his personal expenses totaled $196,190.31. During the same period, according to Ewing's evidence, he spent $520,785.85 for the mutual benefit of Ewing and Connie, including income tax payments, mortgage payments and maintenance on the Trafficway building, and expenses for Jefferson and Jennifer. Ewing's evidence also showed that during the same period Connie spent $278,215.31 for her personal expenses.

At the outset of the separation, Connie removed $70,000 from a bank account held jointly by her and Ewing. She also appropriated $33,939 representing the refund of a deposit made with marital funds on a Florida condominium.

In 1981, HCA entered into a five-year contract with Don Angel, who owned over 50 nursing homes. Angel's contract with HCA had a "90-day termination provision."

In 1985, Angel sold his nursing homes, and HCA also sold its assets. Angel testified that his decision to sell the nursing homes was caused by difficulties with Connie. He said that problems developed between his staff and Connie, and that "we would still be doing business today if it had not been for Connie." He said the major reason he sold the nursing homes was that Connie was not handling the personnel properly.

Carl Frey, who worked for HCA until December 1984, and had been its executive vice president, testified that because of Connie's interference there was disruption and difficulty in dealing with HCA clients.

It will be recalled that the trial court, in addition to dividing the marital property, set apart to Connie nonmarital property which exceeded by $54,000 the nonmarital property awarded to Ewing. The trial court also required Ewing to pay Connie $75,000, to provide medical and hospital insurance for both children until emancipation, and to pay $25,000 as a fee for Connie's attorneys.

Although both Connie and Ewing contributed to the acquisition of the marital assets, it seems clear that Ewing made the major financial contribution. Ewing was guilty of marital misconduct and used HCA assets for the benefit of other enterprises in which Connie had no interest. There is evidence, however, that Connie's business conduct adversely affected and even terminated HCA's highly profitable relations with Don Angel. Connie's argument that the opinions of her experts were more credible than those of Ewing's experts and of Ewing himself merely addresses the weight of the evidence.

After reviewing the entire record, this court concludes that the trial court's division of the marital property, in light of all the statutory factors, is not against the weight of the evidence and in fact is supported by substantial evidence. The trial court is to be commended for the manner in which it conducted the trial proceedings, and especially for its meticulous formulation of its findings of fact. Connie's first two points have no merit.

Connie's third point is that the trial court erred in failing to require Ewing to pay child support for Jefferson Gourley, who was 15 when the judgment was entered, because "Jefferson is the only child under 18 years of age and [Ewing] has a clearly established record of earnings which is far in excess of [Connie's] earnings and, further, the trial court "failed to follow the child support guidelines and failed to make a sufficient finding to justify its failure to follow the guidelines."

Section 452.340.1, RSMo 1990, provides, in pertinent part:

"1. In a proceeding for dissolution of marriage ... the court may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable or necessary for his support, including an award retroactive to the date of filing the petition, without regard to marital misconduct, after considering all relevant factors including:

(1) The financial needs and resources of the child;

(2) The financial resources and needs of the parents;

(3) The standard of living the child would have enjoyed had the marriage not been dissolved;

(4) The physical and emotional condition of the child, and his educational needs."

The trial court required Ewing to provide medical and hospitalization insurance for Jefferson, as well as for Jennifer, until emancipation. The trial court made no award of child support to either party, and ordered the party with primary physical custody of the minor child to be responsible for the support of that child.

Among its findings of fact, the trial court found that Ewing has earnings history of having had income in excess of $300,000 per year since 1982; that Connie has no employment at the present time and has not been employed since the sale of the HCA assets; that Connie and Ewing are each well educated; that both Jefferson and Jennifer have been accustomed to a high standard of living.

The court also found:

"[T]he children are physically and emotionally stable. They participate in all normal extracurricular activities and their educational needs. The court finds their standard of living has not diminished since the dissolution.

Their financial needs are being met, and at that point the children's resources are more than adequate. Both parties have sufficient resources to support one or both of the children....

I may also add in that respect the trust funds of both children are in the neighborhood of $100,000 a piece, and they have sufficient money of their own to educate themselves...."

Rule 88.01, which became effective April 1, 1990, deals with "Presumed Child Support Amount," and creates a rebuttable presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is correct. Although the most recent income tax return filed in this court for either party is the 1986 individual income tax return of Ewing, there is other evidence showing that the respective monthly incomes of both Ewing and Connie exceed the amounts listed in the schedule attached to Form 14.

In *E.C.S. v. J.D.L.*, 529 S.W.2d 423 (Mo. App.1975), the wife had a total net worth of about $2,000,000 and an annual income of $75,000. The husband's assets were valued at approximately $125,000 and he had an annual income of $48,000. The trial court awarded custody of three minor children to the wife, but awarded her no child support. The decree included an agreement that the husband would pay up to $1,000 for medical and dental expenses and $7,000 for educational expenses. The trial court rejected the wife's contention that the trial court erred in refusing to award her any child support.

In *Williams v. Williams*, 510 S.W.2d 452 (Mo. banc 1974), "the financial situation of both parents was practically identical," and the trial court awarded custody of two children to each parent. Prior to modification, each parent was supporting two children. The trial court modified the decree to require the father to pay $25 per week for the support of the children in the mother's custody. The court said:

"[I]f, as here, the total financial resources of the mother and father have been utilized by reason of the custody orders to actually provide equal support for an equal number of children equally divided between the two parents, which children have equal needs, then the shifting of money away from two of the children is not reasonable and in the circumstances of this case constituted an abuse of discretion...."

In the instant case, both Ewing and Connie are affluent. Connie is able to work, but has seen fit not to do so. Each parent is financially capable of supporting both children in a high standard of living. This court holds that the trial court did not abuse its discretion in awarding no child support to either party and in requiring the party with physical custody to be responsible for the support of that child. Connie's third point has no merit.

▪ Connie's fourth point is that the trial court's award of $25,000 attorney's fees to Connie is inadequate and that a larger sum, $100,000, would be appropriate. During the trial, Connie adduced testimony that her attorneys' fees to date exceeded $86,000. In making the award of $25,000, the trial court stated that he had taken into consideration Ewing's conduct with respect to his extramarital affair and the way he had handled the dissolution and the liquidation of HCA. The court also stated that Ewing had caused "many court actions and additional work that would not have been done, because of his dominance in putting property of [HCA] which was liquidated."

▪ In a dissolution action, the trial court has broad discretion in awarding or denying attorney's fees and the award will be disturbed on appeal only upon a showing that the trial court abused its discretion. *Podrecca v. Podrecca*, 794 S.W.2d 329, 332[5] (Mo.App.1990); *Lee v. Lee*, 782 S.W.2d 112, 116[8] (Mo.App.1989). Inability of the spouse to pay an attorney's fee is not a requirement for the awarding of a fee. *Id.* One factor which may be considered in awarding attorney's fees to a

party is the extent to which the other party's conduct required the expense of attorney's fees. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 655[6] (Mo. banc 1989).

This court's examination of the record leads it to believe that the trial court proceedings were unduly protracted and that neither side is blameless for that situation.

This court holds that the trial court did not abuse its discretion in failing to make a larger award of attorneys' fees to Connie. Connie's fourth point has no merit.

The judgment is affirmed.

PARRISH, P.J., and HOGAN, J., concur.