Reba Sue **MURRAY**, Petitioner–
Respondent,

v.

Billie Isom **MURRAY**, Respondent–
Appellant.

No. 17948.

Missouri Court of Appeals,
Southern District,
Division Two.

May 17, 1993.

Scott B. Tinsley, Springfield, for respondent-appellant.

John S. Pratt, Nancy Steffen Rahmeyer, Pratt & Fossard, Springfield, for petitioner-respondent.

FLANIGAN, Judge.

This action for dissolution of marriage was instituted in April 1989 by Reba Sue Murray (Sue), against her husband Billie Isom Murray (Bill). The parties were married on July 9, 1961, and separated on April 5, 1989. Their two children are emancipated.

On December 5, 1991, the trial court issued its decree which (a) dissolved the marriage; (b) set apart to Sue specified property as her nonmarital property; (c) set apart to Bill specified property as his nonmarital property; (d) divided the marital property and awarded Sue, as her share, assets valued at $97,151, and awarded Bill, as his share, assets valued at $75,860; (e) awarded Sue a judgment against Bill in the amount of $10,000—in connection with this award, the court stated that it was made "to partially offset the monies that [Bill] has given to his 28–year–old girl friend and withheld from [Sue], as well as the monies that [Sue] had to draw from her nonmarital funds in order to preserve the marital home. It is the judgment of this court that [Bill's] excessive misconduct and the severe effect it has had on both the marriage and [Sue] justify an award such as this"; (f) ordered Sue to pay certain debts and hold Bill harmless therefrom; (g) ordered Bill to pay certain debts and hold Sue harmless therefrom; (h) ordered Bill to pay Sue the sum of $350 per month as modifiable maintenance; (i) ordered Bill to pay all court costs, and to pay Sue $6,500 for attorneys' fees and legal expenses. Bill appeals. Bill challenges provisions (d) and (h).

Bill's first point is that the trial court erred in dividing the marital property, resulting in a disproportionate share being awarded to Sue, in that the court "used values outside the scope of the evidence, used an inconsistent approach as to responsibility for depleted funds, and failed to adequately consider separate funds and the maintenance award." Bill makes specific complaints which will be stated later.

The property which the trial court classified as marital property was itemized on Exhibit C and Exhibit D and distributed as follows:

Exhibit C—Marital Assets Distributed to Sue

| | |
|---|---|
| Real estate (equity in family home) | $40,030 |
| Motor vehicles, boat and trailer | 25,200 |
| Stocks and bonds, bank accounts, and life insurance | 1,134 |
| Furniture and household goods | 13,060 |
| Other | 17,727 |
| | $97,151 |

Exhibit D—Marital Assets Distributed to Bill

| | |
|---|---|
| Real estate (equity in 1325 West Brookside) | $5,000 |
| Retirement accounts | 26,292 |
| Life insurance policy | 1,378 |
| The New Gold Mine, Inc. (Bill's 50 percent interest) | 33,750 |
| Jewelry | 9,280 |
| Furniture | 160 |
| | $75,860 |

The Dissolution of Marriage Act consigns the division of marital property to the sound discretion of the trial court. *Colabianchi v. Colabianchi*, 646 S.W.2d 61, 64 (Mo.banc 1983). Appellate courts must defer to the trial court's judgment unless the judgment is improper under the principles of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976), or an abuse of discretion is shown. *Dardick v. Dardick*, 670 S.W.2d 865, 868 (Mo.banc 1984). The judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or applies the law. "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy*, at 32.

Section 452.330,[1] as amended by L.1988, provides that in a proceeding for dissolution of marriage the court shall set apart to each spouse his nonmarital property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors, including five factors enumerated in the statute. The four statutory factors which are present here are: (1) the economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; (2) the contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; (3) the value of the nonmarital property set apart to each spouse; and (4) the conduct of the parties during the marriage.

Although the judgment contained findings of fact, neither side made a request, under Rule 73.01(a)(2), for such findings. The rule provides: "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." The facts which follow were specifically found by the trial court or otherwise supported by the record.

■ At the time of trial, Sue was 56 and Bill was 60. The parties separated on April 5, 1989, when Sue found, in Bill's briefcase, cards and love notes written to Bill by his 28-year-old girl friend Jo Ann. Sue immediately filed for divorce, and one week later Bill moved out of the family home and took items of marital property having a value of $47,040. Bill moved in with Jo Ann, with whom he had been having a sexual relationship since October 1987.

On June 20, 1988, Bill and Jo Ann, as joint grantees, obtained title to the residence at 1325 West Brookside, and they took over the mortgage payments. The grantors negotiated mostly with Bill. One of the grantors testified he was paid $4,000 in cash. The trial court found that Bill used marital funds for the down payment and for subsequent payments.

Jo Ann, called as an adverse witness by Sue, testified that she and Bill live in Rogersville. Jo Ann's daughter lives with them. Previously they lived at 1325 West Brookside, which they still own and now rent. She and Bill have made trips together to Alabama, Kansas, and Oklahoma. On advice of her attorney and on Fifth Amendment grounds, she refused to answer whether Bill gave her the money to purchase the Brookside property. She and Bill rent the residence at Rogersville for $600 a month. She testified that Bill has paid the rent, "I don't know how many times." She also testified that Bill cashed about $19,000 from a retirement account, a marital asset, and used that money "for making the house payments." Bill denied giving cash to the grantors of the Brookside property and denied making any payments on it.

Sue's education includes one year of college. Prior to the separation, her health

1. All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

was good. She began a dog kennel operation at the home in 1985, which required her to work long hours and do hard physical labor. Bill testified that the kennel business "made the house payments and paid the utilities and an employee."

As a result of the separation, Sue had a nervous breakdown for which she was hospitalized six weeks. She was unable to maintain the kennel business and closed it in July 1990. The proceeds from the sale of the kennel business were used for kennel expenses and Sue's living expenses. She is under the care of a psychiatrist and is now incapable of maintaining more than a part-time job. She is currently employed as a clerk, working 20 hours per week at $4.25 per hour.

In September 1990, Bill removed $20,013 from a retirement account, which was marital property, and kept all the proceeds. In January 1991, Bill cashed in a life insurance policy, a marital asset, for $1,378. Bill made no accounting to the trial court for the expenditure of these assets.

From the date of the separation, mortgage payments on the marital home were made by Sue. To avoid foreclosure, she had to pay arrearages and expenses, including attorneys' fees. These payments, made out of nonmarital money she inherited from her father, totaled $15,881. Sue's father died in 1984, and she and her two brothers inherited assets. At time of trial, Sue's share remaining on hand amounted to approximately $40,000. A portion of Sue's inheritance had been placed in a $10,000 certificate of deposit in the name of Sue or Bill. Sue cashed that certificate and used the proceeds for her support until they were exhausted in January 1990.

Bill has completed high school. He was trained to operate an insurance business and did so until his retirement in May 1986. He is now self-employed at The New Gold Mine, a pawn Shop of which he is half owner. He works there 35 hours per week. The trial court valued Bill's ownership interest in the pawn shop at $33,750. The trial court made these findings: Bill claims that he has not taken any funds from this business, but the court cannot believe that

Bill would work regularly at a job which paid him nothing. The business consists of significant sums of cash money, and it is very probable that some of this is being removed from the business to the benefit of Bill. The court finds that Bill has an income greater than the pension plan payments of $309 that he receives each month, and the court imputes an additional amount of income in the amount of $1,300 per month, based on the expenses that Bill has testified he has paid and the cash deposit receipts of $13,877 that Bill deposited into his girl friend's account prior to the date of separation, and the corresponding ledger which showed deposits of $21,743 for the same account.

Sue testified that until the separation, Bill had a little brown bag in which he carried large sums of money in $100 bills. "I have seen him flash $100 bills. He did that quite often when he would go to buy something. He would offer them cash. One time I saw him with $8,000 in cash. Since the separation in 1989 Bill has not paid anything to me."

William Compere, a certified public accountant, testified that he had examined the tax returns for The New Gold Mine, Inc. In 1988, the business reported interest income of $18,265. In 1989, the interest income reported was $26,307. In 1990, the interest income reported was $23. The book value of the assets on December 31, 1990, was $67,578. He saw no records for 1990 and 1991.

Bill, testifying for himself, identified Exhibit G as a true statement of his income and expenses, which he signed on May 21, 1991. Exhibit G was admitted into evidence, but Bill has not filed Exhibit G or any of his exhibits in this court. He stated that he worked 25 to 30 hours a week at the pawn shop. "I have been going daily and weekly since [1986], and I haven't gotten one penny for all that time. I work for zero."

The court received into evidence an exhibit offered by Sue which showed her monthly income to be $557, derived from interest on nonmarital funds and her wages. The exhibit itemized her monthly

expenses, which totaled $2,739 and which included a mortgage and utility expense of $927. Sue introduced exhibits showing all of her financial outlays from the time of the separation through the time of trial.

Bill argues that the trial court's division of the marital property was erroneous because: (a) the division awarded $107,501 in existing marital assets to Sue and $50,007 in existing marital assets to Bill, "for a 66%/34% division"; (b) there was no competent evidence to support the trial court's valuation of $33,750 on Bill's interest in The New Gold Mine; (c) the trial court placed a value of $20,013 on a pension fund spent by Bill during the separation and included that in Bill's share of the marital property, but failed to allocate to Sue's share of the marital property the money spent by Sue during the separation which was derived from the kennel business and from the $10,000 certificate of deposit; (d) the trial court failed to consider adequately Sue's nonmarital cash assets of over $40,-000 and Bill's lack of such assets; and (e) the trial court failed to consider adequately Sue's monthly maintenance award of $350.

Bill concedes that the fourth factor in § 452.330, the conduct of the parties during the marriage, "certainly cuts against [Bill] in this case."

Seeking to uphold the trial court's division of the marital property, Sue's brief makes the following cogent argument:

> [Bill] cashed in all the liquid marital assets, resided with his girlfriend, titled a home in his girlfriend's and his names, spent marital funds on his girlfriend for trips, a home, and gifts, refused to preserve the primary marital asset, the marital home, from foreclosure and concealed his income during the pendency of this action. On the other hand, [Sue] had a nervous breakdown caused by the actions of [Bill] which forced her to quit the kennel business and kept her from being able to work on a full-time basis. She was forced to spend nonmarital funds to keep the marital home from foreclosure when [Bill] refused to pay a dime to keep the house during the pendency of the dissolution.

The record shows that prior to Bill's becoming involved with Jo Ann, the economic circumstances of the parties were comfortable. Each had contributed to the acquisition of the marital property. Although Sue inherited money from her father, she was forced to invade those assets to preserve the family home from foreclosure and to pay living expenses and litigation costs. Her health broke, and she is able to work only part-time for minimum wages.

"Equal division of [marital] property is not required and disproportionate divisions are routinely affirmed." *Rapp v. Rapp,* 789 S.W.2d 148, 152[11] (Mo.App.1990).

In *In re Marriage of Gourley,* 811 S.W.2d 13, 20 (Mo.App.1991), this court said:

> In a dissolution proceeding, the proper date for valuing marital property is the date of trial. The trial court is entitled to believe or disbelieve testimony, including expert testimony, of either party concerning property valuations. The trial court has "great flexibility and far reaching power" in dividing marital property, and there is no formula respecting the weight to be given relevant factors which the court may consider. Section 452.330 requires a just division of the marital property, but it does not require an equal division. Dissipation of marital funds by a spouse is a factor which may properly be considered. An appellate court will interfere only if the trial court's division of marital property is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. (Citing authorities.)

The figures in Bill's prong (a) are inconsistent with the figures of the trial court in Exhibit C and Exhibit D set forth earlier. Prong (a) is also inconsistent with the statement Bill makes in his second point to the effect that the assets awarded him and which still existed had a value of "approximately $56,000." Prong (a) assumes that Bill no longer has some of the marital assets which he admittedly took. The trial court made no such finding. Bill's testimony conflicted with that of his girl friend on

whether some of those assets had been invested in the Brookside property.

Bill's prong (b) is factually unfounded. There was testimony that one-half of the existing inventory of The New Gold Mine was worth $33,750. Sue's expert testified that that was a minimum valuation of Bill's interest. Although Bill testified that he had a "Buy–Sell Agreement" with his co-owner, he did not introduce that agreement nor did he remember whether the buy-out figure was $15,000 or $25,000.

Bill's prong (c) is akin to his prong (a). Although Sue gave detailed accounting of her use of the proceeds from the kennel business and the $10,000 certificate of deposit, no such testimony was given by Bill with regard to the pension funds of $20,013, admittedly a marital asset and one which he appropriated.

Prong (d) is factually unfounded. The trial court was aware of Sue's separate property, attached an exhibit itemizing same, and considered it in making its distribution.

With regard to prong (e), the trial court was aware that it was awarding Sue $350 monthly maintenance. The propriety of that award is the subject of Bill's second point. Prong (e) seems to assume that the award is valid, while Bill's second point claims otherwise.

Although both of Bill's points make numerous detailed attacks upon the trial court's findings, neither point challenges the finding of the trial court that imputed to him, in addition to his monthly pension, "an additional amount of income" of $1,300 per month. This court holds that the trial court did not err in dividing the marital property. Bill's first point has no merit.

■ Bill's second point is that the trial court erred in awarding maintenance to Sue of $350 a month because: (a) Bill's monthly expenses of $902 far exceed his monthly net income of $272 from a pension; (b) the existing marital assets awarded Bill had a value of approximately $56,000 and the assets awarded Sue had a value of $107,000; (c) Sue has separate assets of approximately $40,000 and Bill has virtual-ly no separate property; (d) Bill was ordered to pay $10,000 and attorney's fees and costs totaling $6,500 to Sue; (e) one-half of Bill's $272 net income was awarded to Sue; and (f) Sue's net monthly income is $557.07 plus one-half of Bill's pension.

"The trial court's decision regarding maintenance should be affirmed on appeal unless there is no substantial evidence to support the decision, it is against the weight of the evidence or it erroneously declares or applies the law." Wallace v. Wallace, 839 S.W.2d 354, 356[1] (Mo.App. 1992). The trial court is granted wide discretion in awarding maintenance. Id.

In Cates v. Cates, 819 S.W.2d 731 (Mo. banc 1991), the court said, at 734–735:

Under [§ 452.335], the court can award maintenance only where the court finds that the receiving spouse "(1) [l]acks sufficient property ... to provide for his reasonable needs; and (2) [i]s unable to support himself through appropriate employment." Section 452.335.1. [Emphasis added.] Thus, "maintenance issues for support and only for support—and then, until the dependent spouse achieves a reasonable self-sufficiency."

. . . . .

Because maintenance is founded on need, a maintenance award may extend only so long as the need exists. (Emphasis in original.)

At 736 the court said:

Maintenance awards under Section 452.335 serve the purpose of permitting the receiving spouse to readjust financially during a period of dependency until that spouse can achieve a reasonable measure of self-sufficiency.

Bill's brief makes the following statement: "[Bill] concedes that there was sufficient evidence presented at trial to support the trial court's findings that [Sue] was entitled to maintenance. The issue presented here is whether the trial court abused its discretion in the amount of the award."

The foregoing statement by Bill is an admission that Sue lacks sufficient property to provide for her reasonable needs and

is unable to support herself through appropriate employment. Much of the evidence set forth in the discussion of Bill's first point is material to his second point.

Bill's prong (a) is factually unfounded. It is based in part on Bill's Exhibit G, which was received in evidence but has not been filed in this court. It is also inconsistent with the unchallenged finding of the trial court that Bill's income, in addition to his pension, amounts to $1,300 per month.

Prong (b) is factually unfounded for the reasons discussed when Bill made the same contention under his first point.

Prong (c) is factually correct, although Sue has incurred attorneys' fees, yet unpaid, substantially in excess of the contribution which Bill was ordered to make to those fees.

Prongs (d), (e), and (f) are factually correct, but they do not constitute, individually or collectively, factors which as a matter of law invalidate the maintenance award.

Bill makes no response to the following statement contained in Sue's brief:

> The down payment on the house which was titled in [Bill's] and [Jo Ann's] name was made with cash. The deposits in excess of $12,000.00 to [Jo Ann's] account were mostly in cash or a mix of cash and checks. [Bill's] handwriting was on the deposit slips deposited into [Jo Ann's] account. The ledger in [Bill's] handwriting indicated sums of cash. All of this cash was used *before* [Bill] cashed in his retirement account and his life insurance policy. The exhibits indicate that the funds were deposited from May 1988 through March 1989. The home was purchased in 1988. No significant sums were withdrawn from [Sue's and Bill's] joint bank accounts during that time frame. It is clear that [Bill] had ready access to cash.

Once Sue met the requirements of § 452.335.1, set forth in *Cates v. Cates, supra,* which Bill concedes she did, the amount of maintenance and its duration are matters for determination by the trial court after considering all relevant factors, including those enumerated in § 452.335.2. As applicable here, those factors include:

the financial resources of Sue, including marital property apportioned to her and her ability to meet her needs independently; the time necessary to acquire sufficient education or training to enable Sue to find appropriate employment; the comparative earning capacities of Sue and Bill; the standard of living established during the marriage; the obligations and assets of Sue and Bill; the duration of the marriage; Sue's age and physical and emotional condition; Bill's ability to meet his needs while meeting those of Sue; and the conduct of the parties during the marriage.

Considering the record in light of the foregoing factors, and other relevant factors discussed under Bill's first point, this court holds that the trial court did not abuse its discretion in making the maintenance award. Bill's second point has no merit.

The judgment is affirmed.

MONTGOMERY, P.J., and GARRISON, J., concur.