Rose Marie ZIMMER, Petitioner–
Appellant,

v.

James Francis ZIMMER, Respondent–
Respondent.

Rose Marie ZIMMER, Plaintiff–
Appellant,

v.

Patricia Ann LEAGUE, Defendant–
Respondent.

Nos. 18517, 18517–B.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 3, 1993.

Motion for Rehearing or to Transfer
Denied Sept. 27, 1993.

---

**2.** *Thummel v. King* discusses Rule 84.04(d) which is the same as 30.06(d).

Richard D. Crites, Springfield, for appellant.

Robert C. Fields, Springfield, for respondent James Francis Zimmer.

Devon V. Sherwood, Sherwood, Honecker & Bender, Springfield, for respondent Patricia Ann League.

FLANIGAN, Judge.

This action for dissolution of marriage was instituted in 1986 by Rose Marie Zimmer (Rose), against her husband James Francis Zimmer (James). The parties were married on January 21, 1971, when Rose was 19 and James was 22. A son Christopher was born in 1975, and a daughter Katherine was born in 1979. The parties separated in 1980 and, except for a two-week period in 1983, have continued to live apart.

In March 1989, Rose filed a separate action against Patricia League. In May 1989, the trial court consolidated the two cases. In February 1990, the trial court dismissed the action against Patricia. Rose's appeal from that dismissal will be dealt with later in this opinion.

## No. 18517

The dissolution action was tried in July 1990, and Rose appealed from the judgment. In April 1992, this court dismissed that appeal because the judgment lacked finality. *Zimmer v. Zimmer*, 826 S.W.2d 904 (Mo. App.1992).

In November 1992, in the dissolution action, the trial court entered a new judgment which, in addition to dissolving the marriage, contained the following provisions: (a) Rose was granted custody of the two children, and James was granted reasonable visitation rights; (b) certain property was classified as marital property and divided in a manner to be described; Rose was ordered to pay specified debts, and James was ordered to pay specified debts; (c) James was ordered to pay Rose monthly maintenance of $1,000, the maintenance to be non-modifiable but to terminate in June 1997 or upon Katherine's graduation from high school, whichever first occurs; maintenance was also to terminate on Rose's remarriage or the death of Rose or James; (d) James was ordered to pay monthly child support of $1,350 per child, and James was ordered to provide health insurance coverage for both children and to pay expenses incurred for surgery to be performed on Katherine's hand; (e) James was ordered to pay $12,500 toward Rose's attorney fees; (f) Rose was to pay one-half the costs and James was to pay the other half.

Rose appeals and challenges provisions (b), (c), (d), (e), and (f).

The judgment of the trial court found, in addition to the facts set forth earlier, the following: Rose has a Master's Degree in nursing and is a licensed registered nurse; James is a medical doctor and practices radiology; both Rose and James have, for a number of years, conducted themselves as if they were unmarried; the children have no financial resources and would have enjoyed an above-average standard of living if the marriage had not been dissolved; Christopher has a minor learning disability and Katherine has a serious birth defect involving her right hand; in addition to being the children's primary caretaker, Rose has contributed to the family's income and support; "James, however, has supported the family in a comfortable manner since at least entering private practice in 1981"; James voluntarily furnished funds for the household expenses of Rose and the children until August 1986, and since that time has contributed to those expenses under court order; since 1981, James has contributed a net of over $40,000 per year for the support of Rose and the children; the application of the Child Support Guidelines established in Rule 88.01 would be inappropriate considering all the relevant factors, and the sum of $1,350 per month is an amount reasonable and necessary for the support of each minor child; the parties agree that there is no separate property to be set aside to either party; "while all of the [marital] assets have been acquired during the marriage, most have been acquired through James' substantial income and during the parties' separation"; Rose lacks sufficient property to provide for her needs and is the custodian of the two children, "which make it inappropriate at this time to seek full-time employment, and James has the ability to meet his needs while contributing to Rose's support."

■ Rose's first point is that the trial court made inadequate findings of fact in response to Rose's oral request. In the trial court, Rose offered 66 exhibits and James offered 19 exhibits. Many of those exhibits are voluminous. Rose's Exhibit 40, for ex-

ample, consists of income tax returns beginning in 1973 and ending in 1984. Rose's exhibits constitute a stack two and one-half feet high. The trial court's findings made specific reference to several exhibits. Many of the deficiencies which Rose claims to exist in the trial court's findings may be due to the slipshod manner in which some of the evidence was offered. Rose's counsel called James as his first witness, a stroke which some may regard as good trial strategy, but one which created disorganization in the evidence.

The record is adequate for review of Rose's contentions, and all parties would be disserved by another remand. "No appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action." Rule 84.13(b).[1] This court's review of the record, in light of the trial court's findings and the vague and rambling content of Rose's oral request, shows no prejudicial error.

■ Rose's second point is, in general, that the trial court erred in dividing the marital property and in allocating the marital debts, resulting in a disproportionate share being awarded to Rose.

The trial court made the following distribution of marital property and allocation of debts:

### Rose

#### Share of Marital Property

| | |
|---|---|
| Residence in Springfield (1510 N. Washington) | $61,500.00 |
| Automobile | 3,300.00 |
| Household goods and professional equipment | 8,000.00 |
| Time share | 0 |
| | $72,800.00 |

#### Debts

| | |
|---|---|
| Loan on residence | $55,500.00 |
| Misc. unpaid accounts | 9,743.74 |
| Orthodontist (bill on Christopher) | 2,320.00 |

### James

#### Share of Marital Property

| | |
|---|---|
| Residence in Atlanta, Ga. (100 Tinsley Mill Rd.) | $500,000.00 |
| Household goods | 300,000.00 |
| Sun Life ins. policy | 24,000.00 |
| Pension and profit-sharing plans | 137,396.00 |
| Shares in Zimmer Radiology | 500.00 |
| Automobile | 3,500.00 |
| Note receivable | 30,000.00 |
| | $995,396.00 |

#### Debts

| | |
|---|---|
| Unpaid judgment | 3,565.14 |
| Village II Homeowners' Assoc. | 4,055.24 |
| Mayo Clinic | 4,353.90 |
| Rochester Methodist Hospital | 2,665.03 |

1. All references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1986, V.A.M.S.

| Debts | | Debts | |
|---|---|---|---|
| Unpaid attorney's fee | 18,193.10[2] | City Federal Savings (Mortgage on residence) | 377,047.67 |
| | $85,756.84 | Personal note | 38,000.00 |
| | | Misc. unpaid accounts | 3,220.72 |
| | | Unpaid attorney's fee | 24,222.25 |
| | | Contribution to fee of Rose's attorney | 12,500.00 |
| | | | $469,629.95 |
| Net (−) $12,956.84 | | Net (+) $525,766.05 | |

---

■ The Dissolution of Marriage Act consigns the division of marital property to the sound discretion of the trial court. *Colabianchi v. Colabianchi*, 646 S.W.2d 61, 64[3] (Mo. banc 1983). Appellate courts must defer to the trial court's judgment unless the judgment is improper under the principles of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), or an abuse of discretion is shown. *Dardick v. Dardick*, 670 S.W.2d 865, 868 (Mo. banc 1984). The judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or applies the law.

In *In re Marriage of Gourley*, 811 S.W.2d 13 (Mo.App.1991), this court said, *Id.*, at 20:

In a dissolution proceeding, the proper date for valuing marital property is the date of trial. The trial court is entitled to believe or disbelieve testimony, including expert testimony, of either party concerning property valuations. The trial court has "great flexibility and far reaching power" in dividing marital property, and there is no formula respecting the weight to be given relevant factors which the court may consider. Section 452.330 requires a just division of the marital property, but it does not require an equal division. Dissipation of marital funds by a spouse is a factor which may properly be considered. An appellate court will interfere only if the trial court's division of marital property is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. (Authorities omitted.)

Section 452.330, as amended by L.1988, provides that in a proceeding for dissolution of marriage the trial court shall divide the marital property in such proportions as the court deems just after considering all relevant factors, including five factors enumerated in the statute. The four statutory factors which are present here are: the economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; the contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; the conduct of the parties during the marriage; and custodial arrangements for minor children.

■ Although trial courts are not obligated to allocate marital debts, *Vehlewald v. Vehlewald*, 853 S.W.2d 944, 950[10] (Mo.App. 1993); *Johnston v. Johnston*, 778 S.W.2d 674, 677[3] (Mo.App.1989), it is a commendable practice and serves to eliminate future dissension between the parties. Debts of the spouses are not marital property, but the existence of the debts and who has the responsibility for paying them are factors the trial court should consider in a fair division of the marital property. *Id.*

2. The unpaid attorney's fee totals $30,693.10, of which James was ordered to pay $12,500.

When James married Rose in 1971, he was a senior in college, taking a pre-med course. She was a college sophomore. In 1975, James obtained his M.D. at Creighton University, and Rose received a B.S. Degree in nursing from Creighton University Nursing School. In July 1975, they moved to Salt Lake City, where James did an internship and a four-year radiological residency at the University of Utah. James entered the Army as a captain. From 1979 to 1982, he was stationed at Fort Ord, California, where he completed his service obligation. In 1982, they moved to Atlanta, Georgia. In 1984, Rose and the two children moved to Springfield, Missouri.

While James was in medical school, Rose worked temporarily as a nurse's aide. She also worked as a housekeeper and babysitter for a man who had four young children. In Salt Lake City, Rose worked 24 hours a week as a staff nurse in a hospital.

During his first year in medical school, James did not have an outside job. In his second year, the Army paid his tuition, books, and incidental fees and paid him $400 a month. He also obtained student loans and received $4,000 from a relative.

At the trial, James testified that he was not claiming that Rose was guilty of marital misconduct. He admitted that prior to the separation he had on occasion struck Rose. He admitted that in April 1975 he pushed Rose down the stairs when she was in her third trimester of pregnancy. He admitted that in California he had an illicit affair with a radiology technician. He testified that occasionally he resorted to violence in order to stop Rose from asking him not to go to work at Fort Ord and from calling his commanding officer and telling him that James was sick.

James also testified that while they were in Utah, Rose would throw him out of the house for up to a month at a time and that he would be required to sleep on the floor in the storeroom. He said that on several occasions Rose struck him and forced him to sleep in his car in the driveway to the marital home. In 1980, after a fight, Rose locked James out of the house and told him not to come back. When he returned home, he found all of his medical books, except the ones Rose wanted to keep, out on the lawn. It was raining and the books were ruined. Rose destroyed his wardrobe with a razor blade, leaving him only the uniform he was wearing.

In December 1980, Rose filed, in California, a petition for legal separation, but that action did not proceed to judgment. In January 1981, James moved on the military base and lived there until October 1982. In the summer of 1982, Rose and the children moved to Atlanta, where they lived in a house bought by Rose and James. That house was later sold and some of the proceeds were reinvested in the Springfield residence. In October 1982, James came to Atlanta and moved into his own quarters and lived apart from Rose except for a couple of weeks in the fall of 1983.

James testified that he paid for the house in Atlanta in which Rose and the children lived, and that Rose did not want him living there so he got an apartment. He gave Rose over 80 percent of his income during that period, and she refused to pay part of the taxes. James said, "I was paying $150 a month for an apartment and Rose said I needed to get to a cheaper apartment and sell the new car. I sold the car and moved to an apartment in the ghetto. Whatever profit there was from the sale of the house in Atlanta, Rose used to purchase the house in Springfield which I co-signed."

James testified that there was violence "on both sides" and that Rose would yell and scream and throw things. James consulted a psychiatrist and later joined a support group in California involving members who had problems with domestic violence. James joined a similar group in Atlanta.

In May 1984, Rose received her Master's Degree in nursing at Emory University. In the summer of 1984, Rose and the children moved to Springfield, where she worked as a "nurse midwife" in her own practice until 1988, when she took a job as a nurse. She usually worked 32 hours a week.

In the summer of 1985, James met Patricia League, and in 1986 they began cohabitation which continued until the trial. Patricia's two children live with them. Patricia is employed by James' professional corporation, of

which he is the sole shareholder. She is the corporate secretary and is also vice president and treasurer. For the three-year period commencing in 1987, the corporation paid her a salary totaling $167,863.

The respective incomes of Rose and James, aside from payments made by James to Rose, were as follows:

| Year | Rose | James |
|------|------|-------|
| 1981 | 0 | $ 67,619.00 |
| 1982 | $ 4,200.00 | 53,977.00 |
| 1983 | 0 | 71,210.00 |
| 1984 | 1,697.00 | 174,925.00 |
| 1985 | 1,719.00 | 193,629.15 |
| 1986 | 22,803.00 | 251,912.00 |
| 1987 | 21,556.00 | 244,256.00 |
| 1988 | 15,058.00 | 270,797.00 |
| 1989 | 10,891.00 | 182,378.00 |

From 1981 through 1990 James paid Rose the following amounts:

| | |
|------|------|
| 1981 | $32,266.00 |
| 1982 | 37,931.00 |
| 1983 | 44,050.00 |
| 1984 | 44,400.00 |
| 1985 | 39,500.00 |
| 1986 | 30,500.00 |
| 1987 | 30,000.00 |
| 1988 | 30,000.00 |
| 1989 | 30,000.00 |
| 1990 | 30,000.00 |

Payments in 1986 and subsequent years were made pursuant to court order.

James testified that in 1989 his contract with a hospital ended. He said, "I was out looking for a job and lived for three or four months on federal and state income tax refunds." At the trial, James testified that he was making "approximately $240,000 now."

Rose testified that she was working 32 hours a week at $15.50 an hour, and that her monthly income amounted to $1,787, which is $21,444 annually. An expert witness for James testified that in view of Rose's professional experience, Rose could make $33,363 annually as a staff nurse in Springfield.

Rose listed her "regular reasonable monthly expenses," including expenses connected with the children, and they total $8,226.85. She admitted, however, that some of the figures in that listing were inflated. She listed her house payment as $1,100, which was based on what she would have to pay if she lived in a $500,000 house instead of living at 1510 North Washington. James testified that his regular monthly expenses total $9,984.

James testified that Rose made no financial contribution to the acquisition of the assets which he now has in Atlanta, and Rose conceded that was true.

Christopher has a learning disability and Rose's evidence showed that Christopher needs 80 hours of additional treatment at $30.50 an hour. James testified that Katherine "has a congenital deformity in her right hand" and that "she has basically only two fingers, both deformed." Both Rose and James are in good health.

Rose's counsel asked James many questions about checks in substantial amounts, most of which were several years old. One typical response was, "I don't know what these transactions relate to. I am sure they are in the normal course of business. All this innuendo about my escaping with millions of dollars here that are unaccounted for is not the case."

With respect to the four statutory factors involved here, the record shows that James' economic circumstances are far superior to those of Rose. Although Rose was awarded the residence in Springfield where she and the children resided, she has only a $6,000 equity in that home.

The greater portion of the marital property was acquired after the parties separated in 1980, although the marriage continued until 1992. Since James' profession was far more remunerative than that of Rose, most of the marital assets were obtained by the financial contributions of James. Nevertheless, throughout the marriage Rose has been a homemaker and, in essence, since 1980, the sole custodian of the children. James made substantial contributions to Rose and the children during the separation years, but of course he had a duty to do so. He later reduced his contribution when the court ordered him to pay less than he had previously been paying voluntarily.

With respect to the conduct of the parties during the marriage, neither is free of blame. James admitted that he had physically abused Rose on several occasions and that he had an extra-marital affair prior to the separation. On the other hand, the trial court was entitled to lend credence to James' testimony which contained several examples of Rose's shrewishness.

Rose has the custody of the children, subject to James' visitation rights, matters of which James makes no complaint.

Although Rose argues that James "either dissipated or secreted marital assets in the amount of $650,650.19," her argument is based primarily upon James' inability to remember where funds represented by certain checks were expended. James denied secreting or dissipating any funds. On this record, this court defers to the trial court on the matter of his credibility.

If the debts respectively allocated to Rose and James are not considered, James was awarded 93.18 percent of the marital property and Rose was awarded 6.82 percent. If the debts are considered, James was awarded marital assets totaling $525,766.05, and Rose was awarded no assets. Rose's debts exceed her assets.

This court holds that the foregoing division of the marital property is not a just division and that Rose is entitled to a greater share. The marital assets awarded to James, including those listed in the pension and profit-sharing plans, do not lend themselves to simple transfer. For that reason, Rose is awarded a judgment in the amount of $125,000 against James in order to effectuate a just division.

■ Rose's third point is that the trial court's award of maintenance was erroneous with respect to "the amount and length of time of the award," and that the evidence required an award of $2,000 per month until Rose's remarriage or death or further order of the court and, further, that the award should have been retroactive to November 15, 1989, when Rose filed a motion to increase the temporary maintenance award.

Section 452.335.1 sets forth certain matters which the trial court must find before awarding maintenance. The trial court made those findings, and James filed no appeal to contest them.

Section 452.335.2 provides that the maintenance order shall be in such amounts and for such periods as the court deems just, after considering all relevant factors, including nine factors specifically enumerated. The statutory factors present here are: (1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian; (2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; (3) the compara-

tive earning capacity of each spouse; (4) the standard of living established during the marriage; (5) the obligations and assets, including the marital property apportioned to him and the separate property of each party; (6) the duration of the marriage; (7) the age, and the physical and emotional condition of the spouse seeking maintenance; (8) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; (9) the conduct of the parties during the marriage; and (10) any other relevant factors.

Section 452.335.3 reads, in pertinent part: "The maintenance order shall state if it is modifiable or non-modifiable. The court may order maintenance which includes a termination date."

In *Cohn v. Cohn*, 841 S.W.2d 782, 786[9–11] (Mo.App.1992), the court said:

The trial court has broad discretion in determining the duration of maintenance, and an appellate court will interfere only if the award is improper or an abuse of discretion. If there is a reasonable expectation of an impending change in the parties' financial condition rather than mere speculation as to such a change, an award of limited duration maintenance is proper. A party is not required to wait to request modification until it is certain the spouse receiving maintenance will be self-sufficient. (Citing authorities.)

The facts set forth in the discussion of Rose's second point touch upon the nine statutory factors.

The maintenance award, viewed in light of the relief granted Rose by this court in connection with her second point, is not improper or outside the trial court's broad discretion. Rose's third point has no merit.

Rose's fourth point is that the child support award was inadequate and constitutes an abuse of discretion. Section 452.-340.1 enumerates certain factors to be considered in determining the amount of child support. The statute requires that the trial court consider all relevant factors, including: the financial resources and needs of the child, the financial resources and needs of the parents, the standard of living the child would have enjoyed had the marriage not been dissolved, and the physical and emotional condition of the child and his educational needs.

The child support award is set forth in the fourth paragraph of this opinion. Rose's argument under this point makes no mention of the fact that James was ordered to provide health insurance coverage for both children and to pay expenses incurred for surgery to be performed on Katherine's hand. Rose makes no mention of the cost of those obligations. The trial court made a finding that the Child Support Guidelines contained in Rule 88.01 would be inappropriate.

The child support award, viewed in light of the relief granted Rose under her second point, is not improper. The trial court could properly take into consideration the evidence supporting the conclusion that Rose is not fully utilizing her earning capacity. Rose's fourth point has no merit.

Rose's fifth point challenges provisions (e) and (f) of the judgment set forth earlier. The trial court has broad discretion in awarding or denying attorney's fees and the award will be disturbed on appeal only upon a showing that the trial court abused its discretion. *Podrecca v. Podrecca*, 794 S.W.2d 329, 332[5] (Mo.App.1990). This court holds that the trial court did not abuse its discretion in failing to make a larger award of attorney's fees to Rose.

With respect to costs, § 452.355 provides, in pertinent part: "[T]he court from time to time after considering all relevant factors including the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under §§ 452.300–452.415." This court holds that the trial court did not abuse its discretion with respect to taxation of costs in the trial court. The costs of this appeal will be taxed to James.

The judgment is hereby modified so as to include the following additional provision: "Petitioner Rose Marie Zimmer is hereby awarded judgment in the amount of $125,000 against respondent James Francis Zimmer." As so modified, the judgment is affirmed.

No. 18517–B

In March 1989, Rose filed a separate action, No. CV189–539–CC, against Patricia League. The trial court consolidated that action with the dissolution action. Prior to the trial of the dissolution action, the trial court dismissed the action against Patricia. Rose appeals from that dismissal.

■■■ Rose contends that the trial court erred in dismissing the action "in that the petition stated a claim upon which relief could be granted and the trial court had jurisdiction over [Patricia]."

■■■ On appeal, the trial court's judgment is presumed valid and the burden is on appellant to demonstrate incorrectness of the judgment. *Delaney v. Gibson,* 639 S.W.2d 601, 604[4] (Mo. banc 1982); *Austin v. Trotters Corp.,* 815 S.W.2d 951, 957[4] (Mo.App. 1991). If the trial court states no reason for dismissal, the appellate court will assume it acted for reasons offered in the motion to dismiss. *Austin,* at 957[5]; *Chase Elec. Co. v. Acme Battery Mfg. Co.,* 798 S.W.2d 204, 207[1] (Mo.App.1990). The appellate court will sustain a judgment of dismissal if any of the grounds for dismissal is proper. *Sullivan v. Pulitzer Broadcasting Co.,* 709 S.W.2d 475, 476 (Mo. banc 1986); *Henry v. Taft Television & Radio Co.,* 774 S.W.2d 889, 890[1] (Mo.App.1989).

No portion of the 13–page petition is quoted in the statement of facts or argument sections of Rose's brief. The argument section, about one page in length, cites no case or other authority holding that interference by a third party with property involved in a dissolution action constitutes a tort. The only case cited by Rose deals with tortious interference with a business contract.

The only reference to the contents of the petition set forth in the statement of facts section of Rose's brief reads: "Rose sued [Patricia] for: tortious interference with [Rose's] expectancy to receive [Rose's] share of the marital property and court awarded temporary allowances from [James] in [the dissolution action]; to enjoin [Patricia] from aiding and assisting [James] from secreting marital assets and interfering with the collection by [Rose] of any marital assets or support payments which may be awarded to her; and for compensatory and punitive damages for the deprivation of child support payments and marital property acquired by [Rose] and [James]."

The foregoing statements are mere conclusions or summaries of requested relief. They do not state or describe any act on the part of Patricia, nor the place of its commission.

Patricia filed a motion to dismiss containing several grounds including: (1) The petition fails to state a claim upon which relief can be granted; (2) "The exercise of jurisdiction herein by the court violates defendant's right as a non-resident of the State of Missouri to be free of the burden of defending an action in a jurisdiction with which she has not sufficient minimum contacts to make the imposition of that burden fair and reasonable in violation of the due process clause of the Fourteenth Amendment to the United States Constitution"; (3) "This court is an inconvenient forum for this litigation and the petition should be dismissed because the ends of justice require it, in that any cause of action of plaintiff against defendant occurred in the State of Georgia, all witnesses other than plaintiff reside in Georgia, defendant is a resident of Georgia, there is no connection between the litigation and Missouri except plaintiff's residence, this court will be burdened by having to deal with the problems engendered by the fact of the location of witnesses and evidence being in another state, defendant will have great difficulty and expense in defending where the witnesses are non-residents and much evidence would have to be obtained and presented by deposition, and because the State of Georgia provides courts where plaintiff's claims, if any, may be litigated."

Rose's statement of facts says that two hearings were held on the motion to dismiss, but makes no mention of what took place at those hearings. The trial court sustained the motion but did not state the grounds for the ruling.

■■■ *Rose's brief makes no mention of ground 3 contained in Patricia's motion to dismiss.* "The doctrine of forum non conve-

niens permits dismissal even though jurisdiction and venue are proper.... A trial judge may decline to proceed with a case if firmly persuaded that trial in the forum would be substantially inconvenient and that an alternate forum is available." *Acapolon Corp. v. Ralston Purina Co.,* 827 S.W.2d 189, 191[1, 3] (Mo. banc 1992). See also *Friberg v. Chrysler Motors Corp.,* 786 S.W.2d 923, 925[1] (Mo.App.1990).

Rose challenges the trial court's dismissal by saying that the petition stated a claim upon which relief could be granted, but she does not say what the petition stated. She says, in her point, that the trial court had jurisdiction over Patricia but fails to argue what the basis for jurisdiction was. Although a dismissal on the ground of forum non conveniens is permitted even if jurisdiction and venue are proper, Rose makes no mention of ground 3 of the motion, either in her point or in her argument.

In order for this court to interfere with the trial court's dismissal, the following steps would be required: (a) This court must examine the petition and determine its sufficiency, unaided by any citation of authority by Rose; (b) if the petition is found to be sufficient, this court would have to conduct its own inquiry into whether ground (2) or ground (3) of the motion furnished an independent basis for dismissal, an inquiry that might hinge upon the contents of the petition.

The burden is on Rose, the appellant, and not this court, to demonstrate error. She has not done so. See *Austin v. Trotters Corp., supra,* 815 S.W.2d at 957[4–6].

The judgment is affirmed.

PREWITT and MONTGOMERY, JJ., concur.