In re the MARRIAGE OF Marjorie Ellen COLLINS and Glen Dale Collins.

Marjorie Ellen COLLINS, Appellant,

v.

Glen Dale COLLINS, Respondent.

No. 19021.

Missouri Court of Appeals,
Southern District,
Division Two.

May 16, 1994.

Don M. Henry, Henry, Henry & Engelbrecht, P.C., West Plaines, for appellant.

Charles B. Cowherd, Farrington & Curtis, Springfield, for respondent.

CROW, Judge.

Marjorie Ellen Collins ("Marjorie") appeals from a decree dissolving her marriage to Glen Dale Collins ("Glen"). Her sole point relied on asserts the trial court erred "in the division of the marital property and apportionment of debts."

Marjorie's primary complaint concerns the parties' residence—the principal item of marital property. Marjorie presented evidence that the residence was worth $75,000 and was subject to a lien securing a $44,828 debt. Marjorie testified she wanted the trial court to (a) award her the residence, and (b) order Glen to pay half the debt. In its decree, the trial court granted "(a)," but not "(b)." Marjorie maintains the denial of "(b)" was an abuse of discretion.

The parties married March 19, 1988. The union produced no offspring. On the date of trial, May 26, 1993, Marjorie was almost 55 years of age; Glen was 46. Both were in good health.

Before the parties married, Marjorie owned the residence referred to in the second paragraph of this opinion. It was then lien-free. According to her testimony, it was worth "$70,000 or $75,000" on the marriage date.

When the parties married, both were employed, Marjorie as an office worker by a company in West Plains, and Glen as a truck driver by a company in Bolivar. The parties' tax return for 1988 (the year of the marriage) shows Marjorie earned $17,138 that year. Glen was "laid off" by his employer at the end of September, 1988, hence he earned only $15,907 that year. After the layoff, Glen "drew unemployment." He also received $162 per month nontaxable "veterans benefits" throughout the marriage.

In March or April, 1989, Glen was hired by a petroleum company, and worked for it a year.

On September 1, 1990,[1] the parties purchased "Parkside Pantry," a convenience store and gasoline station. To finance the purchase, the parties borrowed $28,000, securing the loan by a lien on the residence owned by Marjorie. Glen began working full time at Parkside Pantry. Marjorie kept her office job; she also worked part time at Parkside Pantry.

In March, 1991, the parties borrowed another $20,000, again securing the loan by a lien on the residence owned by Marjorie. The parties used these funds to construct and equip a garage at Parkside Pantry. Glen operated the garage, selling automobile parts and performing "general mechanics."

Parkside Pantry operated at a loss in 1990 and 1991. Consequently, the parties "let it go back" to the former owners in December, 1991. However, Glen continued to operate the garage until March, 1992, as a renter.

In January, 1992, Marjorie and Glen signed a warranty deed conveying the residence owned by Marjorie to herself and Glen as tenants by the entirety. Marjorie testified she did this because she and he had been happily married for four years and she trusted him. Marjorie explained: "He didn't try to talk me into it, but he did not talk me out of it. He did not try to talk me out of it.... It was my idea totally."

When the parties returned Parkside Pantry to the former owners in December, 1991, the parties received $28,500.[2] Marjorie's evidence showed the following disbursements from that sum: $234 for "settlement charges," $3,254 for interest, $554 for taxes, $9,245 for a "gas bill," and $4,000 to P.A. Anderson to repay a loan by him to Marjorie. That loan, said Marjorie, had been incurred "to pay the bills at [Parkside Pantry]."

As we understand the evidence, this left some $11,211. According to Marjorie, $3,492 of that was used to improve a driveway at the residence, and $5,000 "went into the garage account." The rest, she said, went to her in reimbursement for loans to Parkside Pantry.

---

1. We take this date from a partnership tax return filed by the parties for the year 1990.

2. The details of this transaction are not set forth in the record; however, both parties agree they received $28,500.

Glen testified he began thinking about leaving Marjorie after they got rid of Parkside Pantry. He obtained a job in Mount Vernon and moved to Springfield on April 30, 1992. Thereafter, he and Marjorie saw each other on weekends only.

Glen admitted he met Carolyn J__ "sometime around November 7 [1992]," and became "involved" with her. On November 28, 1992, Glen asked Marjorie for a divorce.

At time of trial, Marjorie was still working for the same employer in West Plains, having become office manager. Her gross earnings are $2,453.58 per month. Glen was still working in Mount Vernon; his gross earnings average $2,457.78 per month. He continues to receive the $162 per month "veterans benefits."

In its decree, the trial court (a) set apart to Marjorie, as her nonmarital property, assets which the court valued, in the aggregate, at $14,575.68, and (b) set apart to Glen, as his nonmarital property, assets which the court valued, in the aggregate, at $1,800.

The trial court found the parties' residence (owned by Marjorie before the marriage but titled in both names during it) was marital property. Marjorie does not challenge that finding. She listed the residence as marital property on an exhibit at trial.

The trial court assigned the residence a value of $75,000 and, as reported in the second paragraph of this opinion, awarded it to Marjorie. Additionally, the trial court awarded Marjorie other items of marital property which the court valued, in the aggregate, at $21,081.04.

There are liens on two items of marital property awarded Marjorie. As noted in the second paragraph of this opinion, the residence is subject to a lien securing a $44,828 debt.[3]

The other item of marital property awarded Marjorie subject to a lien was a 1987 automobile. Marjorie testified the lien secured a debt of "approximately $4,400."

Glen's evidence showed the debt as $5,152. The decree shows the latter amount.

Using the values assigned by the trial court, the marital property awarded Marjorie is worth, in toto, $96,081.04. Reducing that figure by the lien indebtedness shown by Marjorie's evidence leaves a net of $46,853.04. Reducing the $96,081.04 by the lien indebtedness shown in the decree leaves a net of $45,616.45.

The trial court awarded Glen marital property which the court valued, in the aggregate, at $16,300. The principal items were a pickup, a mobile home, and tools. The trial court assigned Glen unsecured debts (credit cards) totaling $1,975. Thus, Glen received "net" marital property of $14,325.

In sum, out of a net marital estate of $61,178.04 (using Marjorie's evidence of the lien indebtedness), she receives assets of the net aggregate value of $46,853.04, and Glen receives assets of the net aggregate value of $14,325. Percentagewise, the split is 76.6 for Marjorie and 23.4 for Glen.

Out of a net marital estate of $59,941.45 (using the lien indebtedness shown in the decree), Marjorie receives assets of the net aggregate value of $45,616.45, and Glen receives assets of the net aggregate value of $14,325. Percentagewise, the split is 76.1 for Marjorie and 23.9 for Glen.

As we understand Marjorie's brief, she does not maintain the trial court awarded Glen any item of marital property she should have received.[4] Instead, as we grasp Marjorie's hypothesis of error, she believes the trial court was wrong "in ordering her to pay the entire indebtedness owed against [the residence] which was incurred by reason of the Parkside Pantry venture."

In support of that contention, Marjorie declares she brought over $120,000 in assets into the marriage, whereas Glen's debts exceeded his assets by over $4,500 when the parties married.

3. Marjorie's evidence showed the debt in that amount. Glen's evidence showed it as $45,-312.59. The decree shows $45,312.59.

4. As explained *infra*, Marjorie asserts the trial court erroneously awarded Glen, as marital property, three pieces of furniture she should have received as her nonmarital property.

Marjorie presented evidence that she owned property with an aggregate net value of some $122,000 at the time of the marriage. Included in that amount were furniture, appliances, and other household contents worth $20,000.

The trial court made no finding about the value of Marjorie's assets before the marriage, none having been requested. However, the trial court was not obliged to believe Marjorie's evidence on the subject. In this judge-tried dissolution action, the trial court was free to believe or disbelieve all, part or none of the testimony of any witness. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[1] (Mo. banc 1989).

Furthermore, Marjorie concedes that before the marriage, she received her "inheritance," approximately $38,000, from her parents. In return, she was to pay them interest on that amount. During the marriage, Marjorie paid her parents interest totaling $7,462.25.

Additionally, during the marriage Marjorie made payments of $20 per month on a lot in which she owns a half interest with her parents. A total of $520 in marital funds was spent for that purpose.

Marjorie presented evidence that Glen's debts totaled $6,141.12 at the time of the marriage. She testified all were paid off during the marriage.

Marjorie does not cite anyplace where the record shows Glen admitted he owed $6,141.12 at the time of the marriage. However, Glen's evidence did show that during the marriage, $3,034 in marital funds went toward payment of debts he owed before the marriage.

Regarding the residence, Glen presented evidence that improvements costing over $11,000 were made during the marriage. They included the driveway (mentioned earlier), an air conditioner, garage door, landscaping, and enclosing the carport. The trial court made no finding about the value of the residence before the marriage.

As observed earlier, the trial court was not compelled to find Marjorie brought assets with an aggregate net value exceeding $122,-000 into the marriage. While she probably had a net worth above $100,000 and Glen had a net worth below zero, the evidence does not mandate a finding that the financial gap between them was as great as Marjorie maintains.

Additionally, we cannot ignore the evidence that more was paid on Marjorie's debts than Glen's during the marriage, and that the value of the residence was enhanced.

Marjorie directs us to her evidence that during the marriage her earnings totaled $120,595, whereas Glen's were only $54,087. However, the latter sum gives Glen no credit for the sixteen months he worked at Parkside Pantry and the three additional months he worked at the garage. Although those enterprises were unprofitable, Marjorie does not assert it was due to lack of effort by Glen. Furthermore, during the four years the parties lived together, Glen received some $7,700 in "veterans benefits" which presumably were used for marital purposes.

Division of marital property is authorized and governed by § 452.330, RSMo Supp. 1988. In performing that duty, a trial court is required to consider all relevant factors including the following four statutory factors applicable here:

"(1) The economic circumstances of each spouse at the time the division of property is to become effective....

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage...."

§ 452.330.1, RSMo Supp.1988.

In denying a motion by Marjorie for a new trial, the trial court found factor "(1)" favored Glen inasmuch as Marjorie's economic circumstances had historically been better than his and her earning capacity is equal to or greater than his. The trial court also found factor "(3)" favored Glen in that, as we have seen, the value of the nonmarital property set apart to him was only one-eighth the

value of the nonmarital property set apart to Marjorie.

The trial court found factor "(2)" favored Marjorie. Indeed, the trial court stated it considered that factor "the weightiest of all factors." The trial court also found factor "(4)" favored Marjorie. However, as we understand the trial court, the only misconduct it found as to Glen was his extramarital adventures after he moved to Springfield. The trial court mentioned no misconduct by Glen while the parties lived together, and Marjorie does not point out any to us. Marjorie testified she was "very happy" with Glen until he asked for the divorce.

Summarizing its division of marital property (and debts), the trial court said:

"The Court has ... given greater weight to the two factors favoring [Marjorie]. To grant her an even more disproportionate share would be to disregard the two factors that favor [Glen]. It is difficult to argue that a party having two factors in his favor should be cut out entirely and left with a substantial negative net worth while the other party is (comparatively) very well off. The Court is not aware of any Missouri precedent (on similar facts) for the distribution requested by [Marjorie], and she has cited none."

■ Division of marital property is entrusted to the sound discretion of the trial court, and its decision should be upheld unless an abuse of discretion is shown. *Colabianchi v. Colabianchi,* 646 S.W.2d 61, 64[3] (Mo. banc 1983). Of course, as recognized earlier, the primary issue in this appeal is not about division of marital property; it is about allocation of marital debt. Section 452.330 says nothing about that subject, and trial courts are not obligated to allocate marital debts. *Zimmer v. Zimmer,* 862 S.W.2d 355, 359[6] (Mo.App.S.D.1993); *Vehlewald v. Vehlewald,* 853 S.W.2d 944, 950[10] (Mo.App. E.D.1993); *Johnston v. Johnston,* 778 S.W.2d 674, 677[3] (Mo.App.W.D.1989).

Nonetheless, it has been repeatedly held that allocation of marital debt is a commendable practice and serves to eliminate future dissention between the parties. *Zimmer,* 862 S.W.2d at 359[6]; *Vehlewald,* 853 S.W.2d at 950[10]; *Johnston,* 778 S.W.2d at 677[3];

*Brisco v. Brisco,* 713 S.W.2d 586, 592[8] (Mo. App.W.D.1986). It has also been repeatedly held that the existence of debts and who must pay them are factors a trial court should consider in dividing marital property. *Zimmer,* 862 S.W.2d at 359; *Vehlewald,* 853 S.W.2d at 950[12]; *Johnston,* 778 S.W.2d at 677[4]; *Oldfield v. Oldfield,* 688 S.W.2d 778, 781[2] (Mo.App.E.D.1985).

■ We shall therefore apply the *Colabianchi* standard—sound discretion of the trial court—in determining whether the trial court erred in declining to order Glen to pay part of the lien indebtedness on the residence.

■ The Supreme Court of Missouri has defined abuse of judicial discretion as an "untenable judicial act that defies reason and works an injustice." *Moore v. Board of Education of Fulton Public School No. 58,* 836 S.W.2d 943, 948[10] (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1270, 122 L.Ed.2d 666 (1993). Said another way, judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Shirrell v. Missouri Edison Co.,* 535 S.W.2d 446, 448[2] (Mo. banc 1976). If reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the trial court abused its discretion. *Id.*

■ Here, it might not have been an abuse of discretion had the trial court ordered Glen to pay part of the lien indebtedness on the residence. However, we need not, and do not, decide that. What we must decide is whether the trial court abused its discretion in denying Marjorie that relief.

Although the issue is close, we cannot convict the trial court of abusing its discretion as defined by *Moore* and *Shirrell.* That is, we believe the issue is so close that reasonable persons could differ on whether such relief should have been granted. That being so, we, as a reviewing court, cannot find the trial court abused its discretion.

In so deciding, we have borne in mind that the net value of the nonmarital property set

apart to Marjorie was eight times that of the nonmarital property set apart to Glen. We are likewise mindful that Marjorie received over 76 percent of the net value of the marital property, against slightly less than 24 percent for Glen.

 In a dissolution action, a trial court is not required to restore the parties to the financial position they enjoyed before the marriage. A trial court cannot create assets, make debts vanish, or turn back the calendar to happier days. A trial court's duty is to make a fair and equitable division of the marital property in light of the circumstances attending each individual case. *Dardick v. Dardick,* 670 S.W.2d 865, 869 (Mo. banc 1984).

The trial court, as we have seen, found Marjorie had cited no case where, on similar facts, a party had been granted the relief she was seeking. We have read the three cases cited in Marjorie's brief. None has facts similar to those here.

We realize that as matters now stand, Marjorie will bear the brunt of the financial loss sustained by Parkside Pantry. However, Glen devoted nineteen months of effort to the venture, when he might have been gainfully employed elsewhere. Furthermore, we infer that payments on the lien indebtedness on the residence were made from marital funds until Glen asked for the divorce in November, 1992.

Had the trial court required Glen to pay half the lien indebtedness on the residence, as prayed by Marjorie, Glen would have ended up with marital debts exceeding the value of the marital property awarded him by over $8,000. Such a scenario would have resulted in Marjorie receiving more than 100 percent of the net marital worth and Glen receiving less than zero, i.e., a negative figure exceeding $8,000. The trial court's rejection of that result was not an abuse of discretion.

Marjorie's other complaint is that the trial court erroneously awarded Glen, as marital property, a couch, a chair, and a recliner. Marjorie asserts those items were her nonmarital property.

Glen points out that Marjorie designated those items as marital property on a list she presented to the trial court.

▆▆▆ If the trial court erred in treating the three items as marital property, the error was invited by Marjorie's evidence. A party cannot lead a trial court into error and then employ the error as a source of complaint on appeal. *Reed v. Rope,* 817 S.W.2d 503, 509[11] (Mo.App.W.D.1991); *Burke v. Moyer,* 621 S.W.2d 75, 82[17] (Mo.App.W.D. 1981).

The decree of dissolution of marriage is affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.